No. 93,931

STATE OF KANSAS, *Appellee*, v. CHATHA TATUM, *Appellant*.

(135 P.3d 1088)

Opinion filed June 9, 2006.

*Stephen B. Chapman*, of Chapman & White, LLC, of Olathe, argued the cause and was on the brief for appellant.

*John J. Bryant*, assistant district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Phill Kline*, attorney general, and were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: This is a companion case to *State v. Winston*, (No. 93,972, this day decided). Chatha Tatum and Charles R. Winston were codefendants and were tried together. Tatum appeals his convictions and sentences for first-degree murder, an off-grid crime (K.S.A. 21-3401), and attempted first-degree murder, a severity level 1 person felony (K.S.A. 21-3401; 21-3301). He raises the following points which he claims require the reversal of his convictions: (1) the admission of gang evidence and (2) the denial of his motion for mistrial based upon admission of gang evidence in violation of K.S.A. 60-455. This court has jurisdiction pursuant to

K.S.A. 22-3601(b)(1). We conclude that no reversible error oc-curred and affirm.

## FACTS

*Overview*

On December 17, 2003, Damon Walls, his girlfriend Kyea Kim-brough, and his friend Terrell Williams drove to Dwayne Coates' house in Kansas City, Kansas, to purchase marijuana. The buy had been prearranged shortly before. When they arrived at Coates' house, Walls parked the car and Williams got out. As Williams walked up to the house, Walls' car was hit by a barrage of gunfire. Walls and Kimbrough both received multiple gunshot wounds. Walls survived but Kimbrough died.

*The investigation*

That evening, Kansas City, Kansas, police officers were investi-gating a crime scene in the 1700 block of Cleveland when they heard about 20 to 30 gunshots in the next block. At first they ducked for cover, not knowing if the shots were directed at them. They then ran between the houses and saw a van speeding away. Shortly after that, they received a call that there was shooting in the 1500 block of Haskell.

When officers arrived at the scene, they found a large number of shell casings in the street in front of 1532 Haskell, along with a large amount of blood on the curb, a shoe, a Ruger 9 mm handgun, a cell phone, and broken glass. Crime scene technicians recovered 21 spent shell casings of different calibers—.223 caliber, .40 cali-ber, and .45 caliber.

As additional officers were being dispatched to the scene, an-other call came in that two shooting victims from the Haskell crime scene were at the fire station about 12 blocks away. At the fire station, officers found a vehicle parked in the driveway. The car had been riddled with bullets and had shattered windows and a flat front tire. Walls was lying on the ground outside the driver's side of the car, and Kimbrough was lying outside the passenger side of the car. Both were being attended to by several firemen or paramedics. Walls had suffered three nonfatal gunshot wounds to

his left side and one to his right foot. Kimbrough suffered six gunshot wounds and died.

At the fire station, Walls identified the shooters as "Edie" and "Charlie" and said they were driving a gray Chevy minivan. The investigation lead the police to suspect that "Edie" was Chatha Tatum. The next day, when Walls was shown a photographic lineup that included Tatum's photograph, he immediately identified Tatum as one of the shooters.

Walls told a detective that he thought "Charlie" was Charlie Allen, that he had a brother named Terry Allen, and that his nickname was "Nose." When Walls was shown a lineup containing a photograph of an individual named Charlie Allen, Walls was adamant that the Charlie who was involved in the shooting was not in that lineup. The detective contacted the Kansas City, Missouri, Police Department's intelligence unit and learned that a man named Charles Winston associated with Tatum and had a brother named Terry Allen. When Walls was shown a photographic lineup containing Winston's picture, he identified him immediately.

Williams was questioned the night of the shooting, but he initially lied about his presence at the scene, telling the police he was just an innocent bystander. However, the next day he admitted he went to Coates' house with Walls and Kimbrough and saw the shooting. He told officers he saw a man he knew as Edie shooting at Walls' car.

Walls' and Williams' versions of the events that night differed somewhat, so they are set out separately below.

### Damon Walls' testimony

When they arrived at Coates' house, Walls noticed a dark-colored minivan parked across the street and another car in front of the van. Walls noticed from the exhaust that the vehicles were running. Williams got out of the car, Fat Mac (involved in arranging the marijuana purchase) got out of the car parked in front of them, and they walked up toward the house. Walls then received a call on his cell phone from Williams, who said, "[H]ey, Bro, that's the dudes from the mall." That remark referred to an incident at Oak

Park Mall earlier that summer where Winston and Tatum had threatened Walls. That incident will be discussed in detail below.

Walls then saw Winston get out of the van and saw Tatum get out of one of the cars parked nearby. He knew Tatum and Winston from the incident at Oak Park Mall, and he had played basketball with Winston at the local community center when he was younger. He saw that Winston had a gun, and Winston pointed it at Walls' car in a gesture that appeared to be intended to let Tatum know that Walls was in that car. Walls tried to slide down into the seat, and then the shooting started. He saw Winston shooting from the front of the van and saw Tatum shooting from the side of the van.

Kimbrough was in the passenger seat, and Walls leaned over and tried to push her out of the car, but she had her seat belt on. He climbed out of the car through the passenger side window, and as he did, he was shot in the foot. The shooting stopped about that time. He opened the passenger door as he lay on the ground and then undid Kimbrough's seatbelt. He heard the van drive off fast. Williams came over to the car, helped Walls get into the back seat, and drove him and Kimbrough to the fire station.

At trial, Walls identified Winston and Tatum as the shooters.

### Terrell Williams' testimony

When they arrived at Coates' house, Williams saw a maroon van parked across the street. There were three to four people in the van. As he walked up to the house, he heard someone in the van asking "[I]s that him, is that him?" He tried to call Walls on his cell phone to ask him if they were the guys from the mall, but he said he did not get hold of Walls.

He then saw Tatum get out of the van, and the shooting started. He dove onto the porch and lay there. He looked through the porch rails and saw two people shooting. However, the only one he saw get out of the van was Tatum. He recognized Tatum from the incident at Oak Park Mall. After the shooting stopped, he jumped off of the porch and began to run when he heard Walls yelling for him. He went over to the car, helped Walls into the car, and drove them to the fire station.

At trial Williams identified Tatum as the shooter he saw that night.

### The Oak Park Mall incident

During the summer before the shooting, Walls, Williams, and Marcus Harris were at Oak Park Mall. Williams saw a group of three guys staring at them. Walls recognized two of the three as Tatum and Winston. A few minutes later, the group approached them and Tatum told Walls he looked like someone Tatum had "popped." Williams recalled that Tatum said, "We killed a nigga looked just like you, we gonna get you too." After Tatum's comment, Winston told Walls that Walls' little brother was going to have to get Walls' name tattooed on his neck next. Walls knew the comment concerned his older brother "Messy Marvin," who had been shot and killed 2 years earlier. Walls had had his brother's name tattooed on his neck after Marvin was killed. Harris took the comment to mean that they wanted Walls dead just like his brother.

Williams then asked what was going on, and Tatum said they had a problem with Walls, they did not like him, and that Walls knew what was going on. Williams asked Tatum and Winston who they were, and Tatum said he, indicating Walls, knew who they were.

Tatum did not actually display a gun that day; however, they all believed that he had one. Williams testified that during the confrontation, Tatum "stressed" that he had a gun. Tatum said, "I'm ready, we can do whatever" and indicated to them he had a gun by the way he had placed his hand and from the "gun print" he saw in Tatum's pocket. Harris saw Tatum tap on a bulge on his hip that looked like a gun.

Although the incident was serious, and he was scared, Walls just "laughed it off" because he did not have a gun with him. After they left the mall, Walls called his grandmother and told her about the incident. He was very upset.

At trial, Walls, Williams, and Harris each identified Winston and Tatum as the men at the mall.

### Gang evidence

The State's theory of the case was that the shooting was gang related in that it arose out of an ongoing conflict between two rival Kansas City, Missouri, gangs. Victim Walls was from Kansas City, Missouri, as were the defendants.

The State filed a motion prior to trial to introduce evidence of gang membership to provide the motive for the shooting and to explain the Oak Park Mall incident. Tatum's counsel filed a motion in limine seeking to exclude evidence of his association with the Hilltop gang unless the State could show that any such association was directly related to the crimes charged. He also sought to exclude any evidence concerning the murder of Walls' brother and any evidence that Marvin Walls' murder provided the motive for the shooting in this case.

There was a pretrial hearing at which the State presented testimony from Kansas City, Missouri, Homicide Detective Everett Babcock to support its request to allow gang evidence. The transcript of that hearing was part of the record in Winston's case but was not included in the record in this case.

The court ruled that the gang evidence would be admissible as the State had established that it was relevant to show a motive for what would otherwise be an inexplicable act.

At trial, the State presented the following gang evidence through Walls, Walls' grandmother, George Anna Myers, and Detective Babcock.

Walls believed the reason Tatum and Winston tried to kill him that night was because of the gang-related murder of his brother almost 2 years earlier. Walls' brother Marvin had been a member of the Kansas City, Missouri, gang called Tre Wall, also known as Third Wall and Tre Tre. Marvin had a Tre Wall tattoo. Tre Wall was in a longstanding feud with a rival Kansas City, Missouri, gang called Hilltop.

Walls testified that Tatum and Winston "claimed" Hilltop. He knew Tatum was a Hilltop member from things he had overheard from his brother. Walls testified that although he personally did not have any problem with Hilltop, his brother's conflict with Hill-

top became his problem too, because that is the way things work with the Kansas City gangs. If gang members have a problem with someone, they also have a problem with that person's little brother. While Walls denied that he was involved in a gang, he admitted that he has friends who are Tre Wall members.

Myers testified that Marvin became involved in a "beef" over some tennis shoes with Terrence Diamond and his associate, defendant Tatum. Diamond was a member of the 51st Street gang, and Tatum was with Hilltop. According to what Walls had told police, Diamond and Tatum were very close friends. Eventually, the conflict escalated, and Marvin shot at Diamond and other Hilltop gang members. Marvin had told Myers he had to shoot at them because the situation had come to the point where they were going to kill him. Both Walls and Myers believe Marvin was killed by Diamond. Additionally, Myers testified that Coates was supplying marijuana to gang members from Hilltop.

Detective Babcock testified about his knowledge of Kansas City, Missouri, gangs and the longstanding violent conflict between the Hilltop and Tre Wall gangs. He testified that Hilltop covers an area of town homes that extends from 17th Street to 23rd Street along Topping in Kansas City, Missouri. He testified that Hilltop is affiliated with other gangs, such as the 51st Street gang. Tre Wall covers the area from Linwood south to about 39th Street and includes the 3000 (Tre) blocks in between.

Detective Babcock testified that indicators that someone is associated with a gang include claiming membership, having gang-related tattoos, and wearing gang colors. He testified that Hilltop members are likely to identify themselves with tattoos of their block, such as 23rd Street. Because Hilltop is considered a Crips set, they often wear blue. Tre Wall is considered a Bloods set, and they often wear red.

Detective Babcock testified that he first heard of "Edie" about 3 years ago, and the name was associated with Hilltop. Since then, he had determined that "Edie" was Chatha Tatum, the defendant. He testified that Tatum is affiliated with Hilltop and that Tatum has a tattoo depicting a street sign with the numbers "Duce" and "Tre" indicating his affiliation with Hilltop.

Detective Babcock testified that Winston is also associated with Hilltop. He testified that Tatum and Winston associated together and were friends, and that Tatum was also friends with Winston's brother, Terry Allen, who is a Hilltop member. He also testified that Walls' brother, Marvin, was a Tre Wall member and had been involved in a conflict with Terrence Diamond, a member of 51st Street, which is affiliated with Hilltop.

Detective Babcock also testified that gang-related homicides are typically an ambush-style attack with multiple rounds, and the witnesses in those cases tend to be uncooperative.

The defense called no witnesses. The jury found Tatum guilty of one count of first-degree murder and one count of attempted first-degree murder. Tatum received a hard 50 life sentence on the first-degree murder conviction and a concurrent sentence of 195 months on the attempted murder conviction. His appeal follows.

## DISCUSSION

### Admission of Gang Evidence

Tatum argues the trial court erred in admitting evidence concerning gang membership and gang activity.

"The first step in determining if evidence is admissible is to determine whether the evidence is relevant. Unless otherwise provided by statute, constitutional prohibition, or court decision, all relevant evidence is admissible. Because relevancy is a matter of logic and experience, the determination of relevancy is generally seen as inherently discretionary. A trial court's discretion must be guided by the considerations imposed by prior case law and by the rules of evidence." *State v. Goodson* (No. 92,662, this day decided), Syl. ¶ 6.

"Relevant evidence means evidence having any tendency in reason to prove any material fact. Materiality requires that the fact proved be significant under the substantive law of the case and properly at issue. While an [evidentiary] fact may be relevant under the rules of logic, it is not material unless it has a legitimate and effective bearing on the decision of the ultimate facts in issue." *Goodson*, Syl. ¶ 7.

Evidence that a defendant is a gang affiliate or is associated with gang-related activity "may be relevant when the evidence provides a motive for an otherwise inexplicable act, forms a part of the events surrounding the commission of the crime, or shows witness bias." *Goodson*, Syl. ¶ 8. "For evidence of gang affiliation to be

admissible there must be sufficient proof that gang membership or activity is related to the crime charged." *Goodson*, Syl. ¶ 9.

Tatum argues that the trial court abused its discretion in admitting gang evidence because there was not sufficient proof that he was a gang member and that the crimes charged were related to gang activity. The State contends this issue was not properly preserved for appeal because Tatum failed to make a contemporaneous objection to the admission of testimony at trial that he was affiliated with a gang. However, although it raises this issue, the State notes that "rather than argue that it was not preserved, the State requests the Court find that the evidence of Appellant's gang affiliation was not erroneously admitted but rather correctly admitted under the case law as argued."

Although contemporaneous objections were not lodged each time gang evidence came up, nor was there a request for a continuing objection, defense counsel did renew at trial the objections to gang evidence made in the motion in limine. Thus, the issue is considered preserved for review. See *State v. Haddock*, 257 Kan. 964, 979, 897 P.2d 152 (1995), *overruled on other grounds State v. James*, 276 Kan. 737, 79 P.3d 169 (2003) (K.S.A. 60-455 issue preserved for appeal where defendant *renewed* his earlier objections to such evidence at trial). Moreover, the trial objections of defense counsel related back to the motion in limine and were sufficient to give the court an opportunity to change its mind on the admissibility of gang evidence. See *State v. Parker*, 277 Kan. 838, 845, 89 P.3d 622 (2004) ("[T]he rationale underlying the contemporaneous objection rule is to permit the trial court to avert error by precluding improper evidence."). The overall purpose of the contemporaneous objection rule was served in this case, and we will address defendant's first issue.

Defendant contends that gang evidence was not admissible because there was not sufficient evidence that he was a gang member and that the crime was gang related. Although the defendant sets out some of the gang testimony presented at trial, his argument is conclusory—he fails to argue how the evidence in this case was lacking.

The only support for his argument is his cite to *State v. Pham*, 27 Kan. App. 2d 996, 10 P.3d 780 (2000), a case in which the admission of gang evidence was found to be an abuse of discretion. Although not cited by the defendant, *State v. Cox*, 258 Kan. 557, 908 P.2d 603 (1995), is also a relevant case on the issue of the sufficiency of predicate proof of gang affiliation necessary for the admission of gang evidence.

In *Cox*, the defendant and four other young people encountered the victim Marcus Smith, surrounded his car, ordered him out and onto the ground at gunpoint, got into his car, and then shot him as they sped away.

Cox and three of the four others were tried jointly. The State's theory was that the carjacking was gang activity. The State's only evidence that Cox was a gang member was Cox's statement that he belonged to three rap groups, and the testimony of a gang expert that gang members sometimes say they belong to rap groups. Additionally, there was no evidence any of the other defendants who were part of the group that night were gang members, nor any evidence suggesting that the motive for the crime was gang related.

The court held the trial court abused its discretion in admitting gang evidence:

"While there was evidence suggesting that the defendants and Kilo were acting in concert, there was no evidence suggesting either gang involvement or gang motivation. The fact that there was evidence suggesting a conspiracy between young people to commit a crime does not make expert testimony regarding gangs relevant. The logic used to find relevancy is flawed. The State through the testimony of its gang expert advanced the premise that a person who belongs to a rap group is a member of a gang: Cox belongs to a rap group; therefore, Cox, the other three defendants, and Kilo are members of a gang." *Cox*, 258 Kan. at 565.

In *Pham*, the Court of Appeals held that the trial court abused its discretion in admitting evidence that the defendant and his companions had gang nicknames because

"there was no predicate proof that this crime was in any way gang-related, much less that Pham's gang membership or activity supplied a motive for an otherwise inexplicable act. [Citation omitted.] . . . In these circumstances, the evidence of gang names had zero probative value." 27 Kan. App. 2d at 1002.

This case differs substantially from *Cox*, where the only evidence that the defendant was a gang member was based on a faulty inference. In this case, the fact of Tatum's gang association was established by Walls' testimony that he knew from his brother that Tatum was associated with Hilltop. Additionally, the State's gang expert testified that he was familiar with Tatum through his work and believed Tatum was associated with Hilltop. His opinion was supported by the fact that Tatum has a "Duce Tre" tattoo indicating affiliation with Hilltop; Tatum associated with Winston, who Walls testified also "claimed" Hilltop; and Tatum was involved with his gang associate Diamond in a gang-related "beef" with Walls' brother.

Further, in contrast to both *Cox* and *Pham*, there was abundant evidence suggesting the motivation for this crime was gang related. At Oak Park Mall, Tatum and Winston, acting together, referenced the prior gang-related murder of Walls' brother "Messy Marvin" and made a veiled threat that Walls would soon be facing the same fate. Then, just several months later, Walls was shot at in a gang-style ambush attack, and the shooters were identified as Tatum and Winston.

The mall incident was pivotal, as it supported the identity evidence, provided evidence of motive, and made the gang-related circumstances surrounding Marvin's murder relevant to provide the necessary context to the threats. To understand the full import of what the codefendants had indicated to Walls at the mall and why they would make such threats to Walls, it was necessary to understand the circumstances behind the gang-related murder of Walls' brother and how the dispute that underlay that killing could expand to become a threat to Walls. Thus, the Oak Park Mall incident suggested the gang-related motivation for the crime, rendering the gang evidence relevant.

In summary, the defendant fails to carry his burden to show the trial court abused its discretion in admitting the gang evidence in this case. Sufficient predicate proof was shown that Tatum was associated with the Hilltop gang and that his gang affiliation and activity was related to the crime charged.

*Motion for Mistrial After Evidence of Other Crimes Admitted in Violation of K.S.A. 60-455*

Tatum argues that evidence of selling drugs in the past and involvement in other homicides was evidence of other crimes inadmissible under K.S.A. 60-455, and, therefore, the erroneous admission of that evidence required a mistrial.

"K.S.A. 22-3423(1)(c) provides that the trial court may terminate the trial and order a mistrial at any time if the trial court determines termination is necessary because '[p]rejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution.' " *State v. Humphery*, 267 Kan. 45, 60, 978 P.2d 264 (1999).

"A trial court's decision on a motion for mistrial is reviewed under an abuse of discretion standard." *State v. Daniels*, 278 Kan. 53, 66, 91 P.3d 1147 (2004).

The defendant's argument is based on two instances in which he claims evidence of other crimes was erroneously admitted by the trial court requiring a mistrial. The first instance occurred during Detective Babcock's testimony about when he first encountered Tatum's nickname:

"Q.: [Prosecutor]:   And as far as Hilltop goes, are you familiar with someone with the nickname Edie?
"A.: [Detective Babcock]:   Yes.
"Q.: When did that name first appear?
"A.: I first started dealing with the first homicide case that got assigned to me—"

Tatum objected, arguing that testimony about his involvement in other crimes violated K.S.A. 60-455. The court expressed some concern over the comment and ordered the State to rephrase the question and in effect to "stay away from" other crimes evidence. The State counters that this testimony by Detective Babcock did not indicate that Tatum was involved in criminal activity. According to the State, the fact that someone is mentioned as part of an investigation is not evidence of criminal activity in violation of K.S.A. 60-455.

We agree. The fact that someone's name was mentioned in the course of a police investigation, without more, is not evidence of a prior crime. K.S.A. 60-455 provides that evidence that a person committed a crime on a specified occasion is inadmissible to prove

his or her disposition to commit crime as the basis for an inference that the person committed the crime charged. The statute "was intended to prohibit usage of a previous crime in another trial to imply the disposition to commit the crime currently being charged. [Citation omitted.]" *State v. Mims*, 264, Kan. 506, 511, 956 P.2d 1337 (1998). *Cf. State v. DeMotte*, 222 Kan. 206, 207, 563 P.2d 476 (1977) (K.S.A. 60-455 does not apply to evidence that defendant dropped a gun at the scene of the burglary where possession of gun not a crime or civil wrong); *State v. Blue*, 221 Kan. 185, 188, 558 P.2d 136 (1976) (rebuttal evidence contradicting defense witnesses that showed the defendant had visited other pharmacies on the day he had presented forged prescription at a pharmacy was not evidence of "other crime" under K.S.A. 60-455).

Assuming for the sake of defendant's argument that some prejudice may have attached with the above testimony of Detective Babcock, the question is whether the admission of this evidence was harmless or prejudicial error. The erroneous admission of other crimes evidence will not require reversal if it did not affect the substantial rights of the defendant. See *State v. Kendall*, 274 Kan. 1003, 1010, 58 P.3d 660 (2002); see also *State v. Edwards*, 264 Kan. 177, 202, 955 P.2d 1276 (1998) (citing *State v. Bornholdt*, 261 Kan. 644, 660, 932 P.2d 964 [1997]); *State v. Henry*, 273 Kan. 608, Syl. ¶ 7, 44 P.3d 466 (2002) ("Normally, the admission or exclusion of evidence is measured by the harmless error rule. In determining if the erroneous admission or exclusion of evidence is harmless, this court must consider if it is inconsistent with substantial justice, *i.e.*, affects the substantial rights of a defendant and, if not, whether this court can declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial.").

Applying this test, the admission of Detective Babcock's statement that he first came across Tatum's name during a homicide investigation did not affect the substantial rights of the defendant and had little, if any, effect of changing the result at trial. First, the statement did not specifically implicate Tatum in prior criminal activity. Second, the evidence of Tatum's motive for this crime was abundant. Further, the victim and another eyewitness, both of

whom knew Tatum from the mall incident, identified him as one of the shooters. Thus, the admission of this testimony was harmless.

The second incident prompting the motion for mistrial occurred when Detective Babcock was testifying about his interrogation of Tatum:

"Q.: [Prosecutor]: Detective, did you ever talk to Mr. Tatum about his involvement with Hilltop?

"A.: [Detective Babcock]: I'm sure that I did.

"Q.: Would your—your report refresh your memory?

"A.: Yes. Yes, sir.

"Q.: And what did he tell you about his involvement with Hilltop?

"A.: He claimed that he was misunderstood, that back in 2000 he saw another homicide victim get killed. He stated prior to that he had sold drugs at Hilltop, but since the day of that homicide—"

Defense counsel objected that Tatum's statements about selling drugs in the past and witnessing a homicide were inadmissible evidence of other crimes under K.S.A. 60-455. The court agreed and sustained the objection. Tatum's counsel then asked for a mistrial. The trial court denied the motion but offered to instruct the jury to disregard the testimony. Tatum's counsel expressed concern that there was no effective cure but agreed to a curative instruction. The trial court instructed the jury:

"Ladies and gentlemen of the jury, you should disregard the last statement that the detective made at one point Mr. Tatum indicated to him that he had sold drugs at sometime in the past. You should disregard that, you should not consider that in your deliberations in this case."

Tatum argues that evidence of selling drugs in the past and involvement in other homicides was evidence of other crimes inadmissible under K.S.A. 60-455, and, therefore, the erroneous admission of that evidence required a mistrial. As indicated above the trial court "may terminate the trial and order a mistrial at any time if the trial court determines termination is necessary because '[p]rejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution.' " K.S.A. 22-3423(c)(1); *Humphery,* 267 Kan. at 60.

The trial court sustained counsel's objection to the testimony and offered a curative instruction, to which counsel agreed. Generally, an admonition to the jury cures the prejudice from an improper admission of evidence. *State v. Navarro*, 272 Kan. 573, 582, 35 P.3d 802 (2001). "Accordingly, where the trial court sustains an objection and admonishes the jury to disregard the objectionable testimony, reversal is not required unless the remarks are so prejudicial as to be incurable." *State v. Gleason*, 277 Kan. 624, 642, 88 P.3d 218 (2004).

The defendant's argument on this issue is conclusory. He merely argues "[t]here was no way to sufficiently cure the prejudice" from the detective's remarks. It is the defendant's burden to prove that he was substantially prejudiced by the remarks. See *State v. Navarro*, 272 Kan. at 582.

Given the curative instruction, the overwhelming evidence against Tatum, and his failure to show how the remarks caused substantial prejudice, it cannot be said the trial court's refusal to grant a mistrial was an abuse of discretion.

Affirmed.