NOT DESIGNATED FOR PUBLICATION

No. 120,689

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CHRISTOPHER D. REED,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; STEPHEN J. TERNES, judge. Opinion filed April 23, 2021. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., GARDNER and WARNER, JJ.

PER CURIAM: A jury found Christopher Reed guilty of 19 crimes, largely stemming from his operation of an online prostitution ring that preyed on young women and minor girls. He appeals, alleging that multiple rulings by the district court deprived him of a fair trial. After carefully reviewing the record and the parties' arguments, we find no error and thus affirm his convictions.

FACTUAL AND PROCEDURAL BACKGROUND

On December 26, 2016, Kansas Highway Patrol troopers responded to a single-car accident just outside of Larned. By the time the troopers arrived, the pregnant driver of the crashed vehicle (later identified as A.M.W.), who was pinned underneath the car, had died. The car's two passengers, Christopher Reed and A.N.R., survived the crash and were taken to a nearby hospital.

One of the responding troopers interviewed Reed at the hospital to ascertain what had happened. Reed told the trooper that they were traveling back to Wichita from Larned, after picking up A.N.R., who was a minor and a nonreported runaway. The trooper asked Reed if he had any contact information for A.M.W.'s family. Reed did not, but A.M.W.'s mobile phone was in Reed's hospital room. Reed gave the phone to the trooper and provided him with the passcode to unlock the device.

The trooper began looking through the phone's contacts, trying to find a relative to call, but he did not see any contact information for A.M.W.'s family. The trooper then began going through A.M.W.'s text messages, trying to find any references to A.M.W.'s mother. As he searched, the trooper came across information that strongly suggested A.M.W. had been involved in prostitution. The trooper kept the phone for further investigation.

A forensic analyst later extracted information from the phone using a Cellebrite UFED 4PC reader, which creates extraction reports on digital devices by retrieving raw data detailing the phone's text messages, contacts, pictures, videos, and web history. Detective Latavia Klumpp of the Wichita Police Department's Exploited and Missing Child Unit reviewed these extraction reports, which revealed Reed's role in an apparent prostitution and human-trafficking scheme. It appeared that Reed had been involved in prostituting A.M.W., and possibly other women, primarily using a website called

Backpage.com. The information gleaned from the phone also revealed that Reed and A.M.W. had arranged to pick A.N.R. up and bring her to Wichita so she could replace A.M.W. in the prostitution ring since A.M.W. was pregnant.

Detective Klumpp continued to investigate Reed's activity over the following months. In July 2017, she came across another minor, A.N.W., who appeared to be soliciting prostitution on Backpage for Reed. A.N.W. had been kicked out of her mother's house. After being put in touch with Reed by an acquaintance, A.N.W. began living at one of his apartments under the condition that she work for him as a prostitute. The apartment complex was owned by Reed's cousin; Reed lived in an upper floor studio, while A.N.W. and other women and girls stayed in an apartment downstairs. A.N.W. used a codename in the Backpage posts—posts that Reed helped her create.

After setting up a meeting with A.N.W. over Backpage, a Wichita police officer went to the apartment complex, arrested A.N.W., and brought her in to the Exploited and Missing Child Unit. Detective Klumpp obtained a search warrant for A.N.W.'s Facebook account and found numerous messages between her and Reed discussing drug sales and prostitution-related activities. The detective interviewed A.N.W., who described the prostitution business Reed conducted from the apartment complex. A.N.W. also described Reed slapping her and on one occasion locking her in a closet for several days as punishment for trying to leave the prostitution enterprise. She said that Reed told her he would let her out of the closet when she got a "date."

Two weeks after A.N.W.'s arrest, Wichita police officers were dispatched to a QuikTrip, where a woman—later identified as A.N.R., the other passenger from the rollover crash in December 2016—had asked employees to call 911 because she had just escaped from a man who had kept her captive and forced her into prostitution. A.N.R. identified Reed as her captor and indicated she had been working at the apartments where the officer had recently arrested A.N.W. A.N.R. told the investigating officers that Reed

3

allowed her to stay at one of the apartments but forced her to prostitute herself for his benefit; he also frequently forced himself upon her sexually. A.N.R. indicated that Reed required her to set up a Backpage account to facilitate the prostitution, telling her how much to charge the men who contacted her and collecting the money when her encounters were over. And she, like A.N.W., told the officers that Reed forcibly and sometimes violently prevented her from leaving the apartment.

Wichita police obtained a warrant and searched the apartment complex. There, the officers seized 25 mobile phones, which were again analyzed by a forensic investigator. Several phones had emails, messages, browser histories, and other information linked to Backpage and Facebook accounts associated with the prostitution ring.

Based on this investigation, Wichita police officers arrested Reed. When he was taken into custody, Reed had a bag of methamphetamine, a bag of marijuana, and several other empty plastic bags in his pockets. The arresting officers also seized a nearby phone. A forensic analysis of this device revealed that both Reed's phone number and email address were associated with several Backpage ads, including those posted with pictures of A.N.W., A.N.R., and several other women.

The State charged Reed with numerous offenses, and the case against him proceeded to trial. The jury found Reed guilty of two counts of sale of sexual relations, sexual exploitation of a child, two counts of aggravated human trafficking, criminal restraint, kidnapping, battery, rape, six counts of unlawful use of a communication facility, possession of methamphetamine, possession of marijuana, and two counts of failure to register as a violent offender. The district court sentenced Reed to 570 months' imprisonment. He now appeals.

DISCUSSION

Reed argues that various rulings by the district court, individually and in combination, denied him a fair trial. For the reasons discussed below, we do not find these arguments persuasive. Thus, we affirm Reed's convictions.

1. *The court did not abuse its discretion when it excluded Detective Klumpp from its sequestration order.*

In the weeks leading up to his trial, Reed filed a motion to sequester all witnesses. While the State agreed that sequestration was generally appropriate, it asked that Detective Klumpp be permitted to remain in the courtroom. The State explained that it would be relying on Detective Klumpp throughout the trial to provide foundation for various forensic evidence that had been gathered from phones and other devices, so it would help the trial flow better if she were allowed to stay in the courtroom gallery. Reed acknowledged that Kansas Supreme Court caselaw vested the district court with discretion to determine whether to sequester witnesses, but he disagreed with that principle and believed Detective Klumpp (and the other witnesses) should be excluded.

Following this discussion, the district court ruled that Detective Klumpp would not be subject to the sequestration order. At trial, Detective Klumpp testified multiple times, always providing background for law enforcement's ongoing investigation or foundation for the State's forensic evidence. On appeal, Reed argues that the district court erred when it allowed the detective to remain in the courtroom, asserting that the detective's presence violated his constitutional right to a fair trial.

In Kansas, a party does not have a right to the sequestration of witnesses. Instead, the decision whether witnesses should be excluded from the courtroom is left to the discretion of the district court. Appellate courts thus review a district court's sequestration decision for an abuse of discretion, finding error only when the district court's decision

5

was arbitrary, fanciful, or unreasonable, or based on an error of law or fact. *State v. Sampson*, 297 Kan. 288, 292, 301 P.3d 276 (2013). Reed bears the burden to show the court's decision to exclude Detective Klumpp from its sequestration order meets this standard. See 297 Kan. 288, Syl. ¶ 4.

Kansas courts have long held that the purpose of sequestration is to prevent a witness from tailoring his or her testimony to that of earlier witnesses, thus allowing the fact-finder to better assess each witness' credibility. *State v. Redick*, 307 Kan. 797, 805-06, 414 P.3d 1207 (2018); *State v. Heath*, 264 Kan. 557, 589, 957 P.2d 449 (1998) (citing *Geders v. United States*, 425 U.S. 80, 87, 96 S. Ct. 1330, 47 L. Ed. 2d 592 [1976]). In *Sampson*, our Kansas Supreme Court emphasized that a district court's discretion in fashioning the scope of a sequestration order necessarily means that a district court "has discretion to make exceptions for certain witnesses to remain in the courtroom even if a sequestration order is in place." 297 Kan. 288, Syl. ¶ 2. This discretion extends to witnesses who are law-enforcement officers. 297 Kan. 288, Syl. ¶ 3.

*Sampson* provided several nonexclusive factors district courts may consider when the State wishes a law-enforcement witness to remain in the courtroom during trial when other witnesses have been sequestered. Among other considerations, a district court may take into account "the complexity of the case, how often the State plans to call the officer to testify, and whether the State could present the same testimony through other witnesses." 297 Kan. at 297. Here, the district court found that Detective Klumpp would be called multiple times to provide foundation for electronic evidence and that she was the only witness who could provide this background. The court weighed these considerations, as well as the State's indication that the detective would not be sitting with counsel (a concern voiced by *Sampson*), and found that it made more sense to allow her to remain in the courtroom.

6

Our review of the trial transcript reveals the reasonableness of the district court's decision. This case was undoubtedly complex, dealing with a months-long investigation following multiple ongoing leads, made more complicated by the forensic extraction of electronic information from cellphones and webpages. And while Detective Klumpp was called multiple times throughout the trial, this case was a far cry from *Sampson*, where a law-enforcement officer testified on numerous occasions and essentially provided an ongoing commentary to the jury concerning other witnesses' testimony. See 297 Kan. at 298-99. Instead, Detective Klumpp's testimony was limited to the nature of the investigation and the evidence—especially the electronic evidence—collected. This was not a situation where allowing Detective Klumpp to remain in the courtroom undermined the purpose of sequestering witnesses. Reed has not shown that the district court abused its discretion when it allowed the detective to remain in the courtroom during the trial.

2. *The district court did not err when it denied Reed's motion for a mistrial.*

Reed also argues that the district court should have granted his request for a mistrial after the State offered two photographs of A.M.W. (the pregnant driver who passed away in the December 2016 car accident). He argues that this information, combined with testimony by A.M.W.'s mother confirming that A.M.W. was pregnant, tainted the jury to such an extent that it would be impossible for him to receive a fair trial.

Some further background is necessary for context. Reed objected to the admission of these two photographs—State's Exhibits 1 and 2—when they were offered into evidence at the beginning of trial. He argued that the photographs were irrelevant, as they were taken before A.M.W.'s death and did not tend to prove an element of any of the crimes charged. Reed asserted that the photographs were highly prejudicial and offered merely to elicit sympathy, especially since one of the photographs showed that A.M.W. was pregnant. The district court overruled the objection, finding the photographs relevant to corroborate A.M.W.'s identity in a Backpage post and showed she owned the phone

7

pictured, which was found at the scene of the accident and contained the information that sparked the investigation into Reed.

After the district court overruled his objection, Reed moved for a mistrial based on the admission of the photographs, as well as a reference by A.M.W.'s mother to a sonogram appointment that confirmed A.M.W. was pregnant at the time of her death. Reed argued that with this information, the trial was "over"—the jury was "not going to find [him] not guilty of anything after they heard that." In response, the State noted that the fact A.M.W. was pregnant was relevant, as it explained why she and Reed had recruited and picked up A.N.R.—to replace A.M.W. in the prostitution ring during her pregnancy. The court denied Reed's request for a mistrial, and the trial continued.

On appeal, Reed does not raise an evidentiary challenge to the admission of these photographs or to the mother's statements regarding A.M.W.'s pregnancy. Instead, he argues that the district court abused its discretion when it denied his motion for a mistrial.

Under K.S.A. 22-3423(1)(c), a district court may declare a mistrial when "[p]rejudicial conduct . . . makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." Our Kansas Supreme Court has explained that district courts engage in a two-step process when deciding whether to declare a mistrial:

- *First*, the district court must determine whether a fundamental failure occurred in the proceeding. *State v. Ward*, 292 Kan. 541, Syl. ¶ 1, 256 P.3d 801 (2011). The analysis of this question varies with the nature of the alleged error—whether the allegation is "based on the actions of a witness, the actions of a bystander, prosecutorial misconduct, or evidentiary error." *State v. McCullough*, 293 Kan. 970, 981, 270 P.3d 1142 (2012).

- *Second*, if a fundamental failure did occur, the district court must assess whether the trial can continue without injustice. *Ward*, 292 Kan. 541, Syl. ¶ 1. In some instances, a limiting instruction or jury instruction may lessen or cure the prejudice that occurred. If those actions would not do so, the court must decide whether the conduct is such that it results in injustice—that is, whether the conduct deprived the parties of a fair trial. *State v. Armstrong*, 299 Kan. 405, 442, 324 P.3d 1052 (2014); *Ward*, 292 Kan. 541, Syl. ¶ 1.

Both analytical assessments involve the exercise of the district court's discretion. Thus, appellate courts will uphold the denial of a motion for a mistrial unless the person challenging the district court's decision can show the court abused its discretion. 292 Kan. at 550-51; see *State v. Burnett*, 293 Kan. 840, 853, 270 P.3d 1115 (2012). This means that Reed must show that no reasonable person would agree with the district court's decision to deny Reed's request for a mistrial, or that the decision is based on an error of law or fact. See *Ward*, 292 Kan. at 550.

As a preliminary matter, we agree with the State that the fact that A.M.W. was pregnant—though certainly prejudicial against Reed—was relevant in this case. A.N.R. explained that the reason Reed recruited her to participate in the prostitution ring was that A.M.W. had become pregnant. In fact, A.M.W. and Reed had picked up A.N.R. and were bringing her back to Wichita for that purpose when they got into the car accident that led to A.M.W.'s death and initiated law enforcement's investigation. Thus, there is a logical connection between the fact of A.M.W.'s pregnancy and the charges against Reed. See K.S.A. 60-401(b) ("'Relevant evidence' means evidence having any tendency in reason to prove any material fact.").

The two photographs of A.M.W. were also relevant, though their connection to the State's case is more remote. State's Exhibit 1 is a close-up photograph of A.M.W. while she was alive; the State indicates that this picture allowed the jury to compare it to a

similar picture of A.M.W. on Backpage, showing she was indeed engaged in Reed's prostitution business. And the State indicated that it offered State's Exhibit 2, a picture A.M.W. took of herself in the mirror when she was a few months pregnant, to show that the phone A.M.W. was holding was the same phone law enforcement retrieved from the scene of the accident (and which led to the officers' investigation into Reed's actions). See *State v. Riojas*, 288 Kan. 379, 387, 204 P.3d 578 (2009) (noting photographs used to prove elements of any of the crimes are relevant because the State must prove every element of the crimes charged).

On appeal, Reed acknowledges that this evidence may have been relevant, but he claims that its relevance was substantially outweighed by its prejudicial effect. See K.S.A. 60-445; *State v. Miller*, 308 Kan. 1119, 1167, 427 P.3d 907 (2018). He points out that the photographs were of limited relevance, but those pictures could have caused the jury to sympathize with A.M.W. and thus taint the jury's deliberations. And he argues that the fact that A.M.W. was pregnant could have invoked a similar reaction.

Courts have recognized that photographs of a person who has since passed away are often of limited evidentiary value. There is a danger that such photographs are offered merely to elicit sympathy from the jury—that is, to cause jurors to enter a verdict based on their emotions, rather than the evidence. Accord *State v. Thomas*, 311 Kan. 905, 913, 468 P.3d 323 (2020) (discussing the problem with appeals to emotion during closing argument). For this reason, Kansas courts have indicated that an otherwise irrelevant photograph of a murder victim before his or her death is inadmissible in a murder trial. See *State v. Hebert*, 277 Kan. 61, 101-03, 82 P.3d 470 (2004) (discussing problems with admitting irrelevant photographs but concluding that a photograph of the murder victim in that case was relevant and admissible).

The fact that Reed was not charged with causing A.M.W.'s death does not render this caselaw inapplicable. But this case is nevertheless different from one where a

photograph is offered solely to elicit an emotional response. The evidence Reed cited as the basis for his mistrial motion had some evidentiary connection—albeit of varying import—to the State's case. Accord 277 Kan. at 103 (finding no error in the admission of a photograph of the murder victim before his death because it was relevant to show identity and other elements of the State's case). Thus, the district court had discretion to weigh the probative value of the pieces of evidence against their prejudicial effect—a judgment to which we defer unless no reasonable person would agree with the court's assessment. See *State v. Soto*, 299 Kan. 102, 112-13, 322 P.3d 334 (2014).

We question whether a district court's decision to admit relevant evidence after the court weighs its probity versus its prejudice results in a "fundamental failure" that could require a mistrial. See *Ward*, 292 Kan. 541, Syl. ¶ 1. Indeed, the discretionary weighing by the district court in Reed's case is substantially different from instances where courts have found such failures in the past. See *State v. Leaper*, 291 Kan. 89, 96-104, 238 P.3d 266 (2010) (conduct of witness in allegedly stealing an offered exhibit from witness stand); *State v. Foster*, 290 Kan. 696, 718-21, 233 P.3d 265 (2010) (conduct of bystander in crying during victim's testimony); *State v. White*, 284 Kan. 333, 340-44, 161 P.3d 208 (2007) (prosecutorial error in the form of inappropriate questioning and argument); *State v. Tatum*, 281 Kan. 1098, 1110, 135 P.3d 1088 (2006) (evidentiary error in admitting K.S.A. 60-455 evidence).

But we need not resolve this question here—just as we need not determine whether the court abused its discretion in finding the photographs and statements regarding A.M.W.'s pregnancy admissible—because Reed's argument fails on the second step of the *Ward* analysis. That is, even if the admission of this evidence were a fundamental failure in the trial, Reed has not shown that the evidence made it "impossible to proceed . . . without injustice." *Ward*, 292 Kan. 541, Syl. ¶ 5. In other words, Reed has not shown that the admission of this evidence affected his substantial rights under Kansas' harmless-error analysis. See K.S.A. 2020 Supp. 60-261; 292 Kan. 541, Syl. ¶ 5.

11

The State presented substantial direct and circumstantial evidence connecting Reed to each of his crimes of conviction. This evidence consisted of testimony from law enforcement and from women who had been under Reed's power, along with considerable digital forensic evidence linking Reed to the crimes charged. After carefully reviewing this evidence, we are confident that the jury's verdict would have been the same even if State's Exhibits 1 and 2, along with the fact that A.M.W. was pregnant, had been excluded. In short, the admission of this evidence did not affect the outcome of Reed's trial. Thus, the district court was correct in its ruling that Reed's trial could continue without injustice, and we find no error in the court's denial of Reed's request for a mistrial.

3. *Reed has not shown any error in the wording of the verdict form.*

Reed also argues that the organization of the verdict form, which placed the lines where the jury could find him "guilty" above the lines where the jury could find him "not guilty," violated his right to the presumption of innocence under the Sixth and Fourteenth Amendments to the United States Constitution.

Kansas courts have considered this argument on myriad occasions, consistently finding it unpersuasive. The Kansas Supreme Court again recently rejected the argument Reed raises here, declining to depart from its previous decisions in *State v. Wesson*, 247 Kan. 639, 652-53, 802 P.2d 574 (1990), *cert. denied* 501 U.S. 1236 (1991), and *State v. Wilkerson*, 278 Kan. 147, 159, 91 P.3d 1181 (2004). See *State v. Fraire*, 312 Kan. 786, 796, 481 P.3d 129 (2021). In *Fraire*, the high court recognized that, as a practical matter, "jurors are probably not closely examining the verdict form before they begin their deliberations." 312 Kan. at 796. And it is likewise "unrealistic to suggest they change their collective conclusion when the foreperson starts to fill out the form." 312 Kan. at 796. Thus, unless a defendant can show the jury altered its analysis based on the wording

of the verdict form—often an unattainable task—the placement of "guilty" and "not guilty" on the verdict form does not present an error of law.

The Kansas Court of Appeals is bound by *Fraire*'s ruling. See *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). And the *Fraire* court's discussion is dispositive. Reed provides no support for his argument that the wording of the verdict form informed the jury's deliberations, merely alleging that the jury might have been misled. For the reasons explained in *Fraire*, we are not persuaded by Reed's speculation. We find no error in the verdict form.

4. *The facts of this case did not support an instruction on criminal restraint as a lesser included offense of aggravated kidnapping.*

Reed next challenges the district court's ruling that an instruction on criminal restraint as a lesser included offense of aggravated kidnapping was not factually appropriate. Reed was charged with aggravated kidnapping based on his interactions with A.N.R.—holding her captive to force her to engage in prostitution. Reed points out that the court instructed the jury on kidnapping as a lesser included offense of aggravated kidnapping, and the jury convicted him of simple kidnapping, not the aggravated offense. He argues that the court should have also granted his request for an instruction on criminal restraint.

Because Reed requested an instruction on criminal restraint at trial, our review involves a two-step analysis. We first consider whether the court erred when it denied Reed's request—that is, whether the instruction was legally and factually appropriate. Only when faced with a legally and factually appropriate instruction do we continue to the second step of our analysis and consider whether the error requires reversal. *State v. Johnson*, 304 Kan. 924, 931, 376 P.3d 70 (2016); *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 (2012).

13

The parties agree that, from a purely legal standpoint, criminal restraint is a lesser included offense of aggravated kidnapping. See *State v. Simmons*, 282 Kan. 728, 742, 148 P.3d 525 (2006). Criminal restraint, kidnapping, and aggravated kidnapping all involve a restraint or confinement of the victim. But criminal restraint involves knowingly restraining someone "to interfere substantially with [his or her] liberty," while kidnapping and aggravated kidnapping require a showing that the confinement be done with the specific intent to accomplish some other harm (like "inflict[ing] bodily injury or . . . terroriz[ing] the victim"). Compare K.S.A. 2020 Supp. 21-5411(a) with K.S.A. 2020 Supp. 21-5408(a)(3) and (b). In other words, criminal restraint includes the confinement element of kidnapping and aggravated kidnapping but lacks those crimes' element of specific intent.

Our inquiry does not end with this legal analysis, however. Instead, we must consider whether an instruction on criminal restraint was *factually* appropriate—that is, whether "there is some evidence which would reasonably justify a conviction" of criminal restraint under these facts. K.S.A. 2020 Supp. 22-3414(3). Because the difference between criminal restraint and aggravated kidnapping lies in the crimes' intent elements, we must determine whether there was evidence at trial to support a finding that Reed knowingly and substantially interfered with A.N.R.'s liberty *without* intending to injure or terrorize her.

After reviewing the evidence, we agree with the district court that a criminal-restraint instruction was not factually appropriate here. A.N.R. testified that she was not allowed to leave the apartment, or Reed would hit her. She explained that on one occasion, after she tried to escape, Reed locked her in a closet in his apartment and beat and choked her. She stated that Reed only allowed her to leave when she was "behaving"—meaning selling herself for his benefit. When she first spoke with law enforcement, A.N.R. told the officers that she had been held hostage and forced into sexual activity. The morning she finally escaped, Reed had attacked her—hitting her with

14

his fists and his belt, choking her, and slamming her hands in the door—for trying to leave. She explained that Reed told her, "I need to listen to him. I'm not going anywhere. I belong to him."

Reed concedes that the evidence showed that he knowingly restrained A.N.R. But he argues that any confinement was minimal and his intent was "not to terrorize" A.N.R., but "to get her to behave." We find this distinction a matter of tasteless semantics. Reed admits that he acted with the intent to force A.N.R. to "behave"—an ugly euphemism for forcing A.N.R. to submit to his will and prostitute herself.

Based on the evidence and the parties' arguments, the jury could have convicted Reed of aggravated kidnapping or kidnapping if the jurors believed A.N.R.'s testimony. Or the jurors could have acquitted him of these charges if they did not find her account persuasive. But there was no evidence that Reed restrained A.N.R.'s liberty without any further specific intent to injure her or to force her into prostitution. Viewing the evidence in the light most favorable to Reed, the district court did not err when it concluded an instruction on criminal restraint was not factually appropriate in this case.

5. *Reed has not shown the district court erred, much less committed multiple errors that would cumulate to deny him a fair trial.*

Reed last argues that even if these alleged errors individually do not justify reversal, the combined effect of the court's rulings denied him a fair trial. But a defendant cannot prevail on a claim of cumulative error when no errors, or only a single error, occurred at trial. See *State v. Lemmie*, 311 Kan. 439, 455, 462 P.3d 161 (2020). Reed has not persuaded us of any error by the district court, much less multiple errors that might aggregate to undermine the fairness of the proceedings. We therefore affirm Reed's convictions.

Affirmed.