NOT DESIGNATED FOR PUBLICATION

No. 117,413

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOURDAN MICKEL HUNT,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; EVELYN Z. WILSON, judge. Opinion filed September 28, 2018. Affirmed.

*Corrine E. Gunning*, of the Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., PIERRON and BUSER, JJ.

PER CURIAM: Jourdan Mickel Hunt appeals his convictions of one count of second-degree intentional murder and two counts of aggravated battery.

In the late afternoon of May 31, 2014, several young men were playing basketball and hanging out at Freedom Valley Park in Topeka. As the group congregated in the parking lot, Hunt drove past the park and shot several times toward them. A bullet struck Ahmad Rayton in his upper left buttock as he ran from the parking lot. Ahmad ran to his aunt's house and someone took him to the hospital. Sergeant John Sanders of the Topeka

1

Police Department (TPD) Crime Scene Unit (CSU) recovered Ahmad's clothing from the hospital. Sgt. Sanders discovered the bullet fragment that had gone through Ahmad's body and fell into his pocket.

A bullet struck Anthony Marshall as he ran from the parking lot. He remained on the ground until the shooting had stopped then drove to Tricia Whitehead's house. When he arrived, he was covered in sweat and blood. Whitehead's daughter Angela drove him to the hospital.

Germaul Rayton was shot in the right side of his back. The bullet went through his right lung, damaged one of the major branches of his pulmonary arteries, and exited through his chest. Once the shooting stopped, Victor Retana and Gionni Slaughter took Germaul to the hospital. Germaul died from the gunshot wounds.

Gionni reported seeing a red SUV drive by the parking lot slowly before the shooting began. Anthony also reported seeing a red SUV and stated the "Mexican-looking" driver shot at the group in the park. Victor told officers that somebody in a red Ford Explorer was responsible for the shooting. Germaul had previously introduced Victor to the shooter and although he could not remember the shooter's name, he believed it began with a J. Ahmad denied that anybody at the park shot back at the vehicle.

Celia Vega contacted TPD with concerns that the situation was going to escalate. She informed the police that she did not know if Hunt was the shooter, but she had information that Germaul's family had planned retaliation against him. She provided police with the address of Hunt's mother's house in Lawrence.

TPD Officer Jared Strathman went to the Lawrence address in the early morning hours of June 1, 2014 where he waited in the backyard with a Lawrence police officer. After about two hours, Hunt exited the back door, walked along the edge of the house,

2

jumped over a railing, and stayed in the shadows as he approached the fence. When he neared Strathman, Strathman shined his flashlight on Hunt and matched him to the physical description of the shooter. Although he denied being Jourdan Hunt, the officers arrested him.

Sgt. Sanders processed the scene at the park. He collected multiple 9 mm cartridge cases in the street and .40 caliber cartridges in the parking lot. He also discovered a cocked and loaded .380 pistol wrapped in an athletic-type jacket. There was no indication that the .380 had been fired. Sanders collected a bullet fragment with a small piece of a jacket on the outside from the north side of the lot. Officers determined that from the bullet skip marks on vehicles that had been in the parking lot and the cartridge case locations, there had been shooting from both the parking lot and the street.

Sgt. Sanders collected evidence from the house in Lawrence and Hunt's SUV that was parked outside. Duct tape covered a hole in the driver's door and a hole on the interior of the door that lined up with the hole on the exterior. There were no other bullet holes in the SUV. In the SUV, Sanders found several cartridge cases and cartridges of various calibers. He found three 9 mm cartridge cases, one 7.62 cartridge, one .223 cartridge, and a .40 caliber cartridge. Sanders also found an empty Glock box behind the passenger seat. The serial number on the Glock box matched the serial number of a 9 mm Glock TPD returned to Hunt in April 2014. Inside the home, he found a bag that contained a loaded magazine for a 9 mm Glock and one for a .40 caliber pistol.

Police received a Topeka address for Hunt. Sgt. Sanders searched the Topeka home and found the owner's manual for the 9 mm Glock and cartridges, some fired and some unfired, with reloading supplies.

Detectives Ky Shorb and George Henley interviewed Hunt for nearly an hour before he informed them that he no longer wished to talk to them and wanted an attorney.

3

The detectives left Hunt in the interview room and went to the house in Lawrence to interview the people who had been present while Hunt was there. When they returned, they informed Hunt that he was under arrest for murder. He then agreed to speak to them again. Because the State provided a redacted version of the interview recording, it is unclear at which point in the recording the morning interview ended and the afternoon interview began.

Hunt stated he had been in Topeka on the morning of May 31, 2014, but he left around noon. He spent most of the day at his mother's home in Lawrence. He contended that he did not know what shooting the detectives were asking him about. Eventually, he stated he had been driving around that afternoon and had inadvertently turned onto 14th St. near the park entrance. He saw several people at the park, including two men who had previously shot him and attempted to rob him. As he drove past, the group at the park shot at him and he fired back. He later stated he was unsure who had shot first, but he started shooting when he saw them reach for their guns. He changed his statement again in stating he did not realize the people in the park were shooting until after he had already started shooting. He believed that if he did not shoot first they would have shot him. Hunt further expressed that if he had known Germaul was at the park he would have removed himself from the situation and kept driving. The State charged Hunt with one count of murder in the first-degree and two counts of aggravated battery.

Two days later, CSU Officer Ross Gustafson returned to the park to look for bullet holes in the houses and fences lining the street. He found one bullet hole in the house on the corner of 14th St. and Illinois.

Kansas Bureau of Investigation firearm and tool mark examiner Zachary Carr testified that the 9 mm cartridge cases in the street had been fired from the same gun as the cases in Hunt's vehicle. He also determined that six of the .40 caliber cartridge cases from the parking lot were fired from a single gun. Some .40 caliber cases were

4

inconclusive and two other cases had been fired from a different firearm. Although Carr was unable to identify the caliber of the bullet fragments collected, he concluded that one was from the .38 caliber family, which includes 9 mm, .38 special, and .357 caliber. Both bullet fragments were too heavy to have been a .380 caliber or .40 caliber.

In mid-February 2015, Cesar Vega, who was incarcerated at the Shawnee County jail, sent a letter to the State in which he claimed he had been at the park and witnessed the shooting. On the Friday before trial, one and a half weeks after the postmarked date on the letter, Det. Shorb interviewed Vega at the El Dorado Correctional Facility. The State received the report and recording of the interview over the weekend. The State notified Hunt on the morning trial was to begin. The district court postponed trial one day so Hunt could speak with Vega.

Vega claimed that before the shooting he met Germaul at the park and the two smoked marijuana in Vega's car. He believed the other men in the parking lot were fighting as a gang initiation. One of the men approached the car and informed Germaul that somebody was going to "air him out." When Germaul got out of the car, Vega saw someone hand him a gun. He then saw at least six of the men in the parking lot pull out their guns and begin shooting toward the street. He claimed the man who gave Germaul the gun was the first to shoot. When the shooting started, Vega crawled out of the passenger side door and took cover at the front of his car. Vega saw Germaul get shot and limp around holding his side as he and the other men picked up cartridge cases from the parking lot. He stated that before he left the Park, he saw Germaul walk to a car.

Because Vega's recollection of the events contained hearsay statements from Germaul and unknown third parties, the State moved for an order in limine to prohibit Hunt from mentioning, discussing, eliciting from witnesses, or otherwise commenting about the statements. The district court granted the motion. During trial, the court prevented Hunt from eliciting statements that the men at the park were engaged in gang

5

activity at the time of the shooting, stating it was "just speculation without evidentiary backing." The court found that questioning Vega about gang initiation procedures was more prejudicial than probative.

The jury convicted Hunt of one count of second-degree intentional murder for Germaul's death and two counts of aggravated intentional battery for injuries incurred by Ahmad and Anthony. At sentencing, Hunt moved for a new trial or judgment of acquittal based on newly discovered evidence. In an unrelated case, TPD officers interviewed Donald Rayton, Jr. nearly one month after the park shooting. He stated Germaul's death was a result of gang retaliation from a shooting in Lawrence the night before. Donald implicated Eduardo Retana, Victor's cousin, in Germaul's death. Hunt asserted that Donald's interview provided exculpatory information that Hunt was not the shooter and presented credibility concerns about Victor, who had provided statements to investigators following the park shooting. Hunt also asserted the State had committed a *Brady* violation by not disclosing the evidence in discovery.

The district court took the motion under advisement, later denying the motion via memorandum decision and order. The court found that the State inadvertently failed to disclose the statements and, although the statements were favorable to Hunt, they were not material. It held the statements carried no evidentiary weight, as they "constitute little more than unfounded rumors, speculation, and hearsay." The court noted that abundant evidence linked Hunt to the shooting and "there is no chance the speculation of an inmate who had been incarcerated since before the date of the shooting itself would put the facts of the case in a different light so as to undermine confidence in the verdict."

The district court sentenced Hunt to 176 months' incarceration for second-degree murder and 41 months' incarceration for two counts of aggravated battery. All three sentences were to run consecutive, giving Hunt 258 months' incarceration with 36 months of postrelease supervision.

Hunt appeals his convictions.

*Motion in Limine*

Hunt contends the district court abused its discretion by refusing to allow evidence that the men at the park had been engaged in gang activity. The information would have provided support to his theory of self-defense. He asserts the information was admissible and its probative value outweighed its potential prejudice. Hunt claims excluding the evidence that the men at the park were involved in gang activity before the shooting violated his right to present his defense under the United States and Kansas Constitutions.

For evidence to be admissible, it must be relevant. To be relevant, evidence must be both material and probative. "Material evidence tends to establish a fact that is at issue and is significant under the substantive law of the case. Probative evidence requires only a logical connection between the asserted fact and the inference it is intended to establish." *State v. Robinson*, 306 Kan. 431, 436, 394 P.3d 868 (2017). This court conducts a de novo review of the materiality of evidence. *State v. Shadden*, 290 Kan. 803, 817, 235 P.3d 436 (2010). Such review determines whether the fact was "significant under the substantive law of the case and properly at issue." *State v. Peppers*, 294 Kan. 377, 387, 276 P.3d 148 (2012) (citing *State v. Reid*, 286 Kan. 494, 505, 186 P.3d 713 [2008]).

The appellate court reviews the probative value of the evidence under an abuse of discretion standard. Evidence is probative if it tends to prove any material fact. *Peppers*, 294 Kan. at 387. Evidence of gang affiliation is admissible only with sufficient proof that gang membership or activity related to the crime charged. 294 Kan. at 387 (quoting *State v. Tatum*, 281 Kan. 1098, Syl. ¶ 3, 135 P.3d 1088 [2006]). Even if we determine the evidence was relevant, the district court may exclude it if it is more prejudicial than

probative. We review the district court's weighing of prejudice and probative value under an abuse of discretion standard. *Peppers*, 294 Kan. at 387. A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the district court; (2) is based on an error of law; or (3) is based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015). Speculative evidence is inadmissible. *State v. Seacat*, 303 Kan. 622, 643, 366 P.3d 208 (2016).

During trial, the district court heard the State's motion in limine over restrictions on Vega's testimony. Hunt did not object to the motion, stating that Vega was only going to testify about his observations and not to any statements he may have heard. The court granted the motion.

During Detective Shorb's testimony, Hunt sought to elicit testimony that the TPD Violent Crime Unit (VCU) became involved in the investigation because of gang activity. Upon the State's objection, Hunt explained that Vega would testify that he was at the park before the shooting and had seen the men at the park engaging in a gang initiation. Vega had stated the men at the park had shot at Hunt first to gain status in a street gang. The court sustained the objection unless and until a witness testified about the connection between gang activity and the shooting. It also stated that such evidence was speculative and lacked evidentiary backing at that point.

Before Vega's testimony, the State renewed its motion in limine. It requested that the district court exclude any testimony about gangs or gang activity at the park. The State noted that no evidence that the shooting had been gang activity had been presented and it was irrelevant and more prejudicial than probative. Hunt contested the motion stating that Vega would present evidence and establish a foundation about the activity at the park. He contended the information was relevant because it supported his assertion that the men at the park had shot first. The court granted the motion about whether gang

8

initiation or promotion occurred at the park because it was speculation and had the potential for undue prejudice that outweighed the probative value.

Gang affiliation is admissible only if it is relevant. *Peppers*, 294 Kan. at 386 (citing *State v. Brown*, 285 Kan. 261, 297, 173 P.3d 612 [2007]). "As a prerequisite for the testimony of a witness on a relevant or material matter, there must be evidence that he or she has personal knowledge thereof, or experience, training or education if such be required. Such evidence may be by the testimony of the witness himself or herself." K.S.A. 60-419. Whether an adequate evidentiary foundation was laid is a question of fact that largely rests in the discretion of the district court. *State v. Garcia*, 40 Kan. App. 2d 870, 875, 196 P.3d 943 (2008) (citing *State v. Rohr*, 19 Kan. App. 2d 869, 870, 878 P.2d 221 [1994]). If the findings were supported by substantial competent evidence, the appellate courts will not disturb the findings. *Garcia*, 40 Kan. App. 2d at 875. Speculative evidence, which lacks foundation, is inadmissible. It is the district court's responsibility to ensure that speculative evidence does not reach the jury. *Seacat*, 303 Kan. 622, Syl. ¶ 3.

Hunt contends that Vega was going to establish a foundation for his testimony about gang activity at the park based on his own experiences in gangs. However, the district court prevented Hunt from asking Vega questions about gang activity to lay the foundation for his belief that the men at the park were engaged in gang activity. Hunt asserts sufficient evidence to provide foundation had already been presented through the assignment of VCU to the case, numerous statements supporting the initial concern that the shooting was gang related, the color of clothing worn by the men at the park, and Germaul's "357" tattoo.

Yet when Hunt asked Det. Shorb about the VCU's assignment to the shooting, he asked: "And the [VCU] specifically looks into gang crimes, correct?" To which Det. Shorb replied: "Some of their function is gangs, yes." When Hunt followed up with:

9

"Wasn't that their purpose in this investigation?" the State objected and Det. Shorb did not answer. The court subsequently found the assertion of gang activity was speculation. To that point, the State had presented no evidence that the shooting had been gang related. Although Det. Shorb agreed that some function of the VCU related to gang crimes, he did not state that VCU solely investigated gang crimes. The record contains no reports or documentation to support the conclusion that the shooting had been gang related. The court's finding that such questioning was speculation with no evidentiary backing is supported by substantial competent evidence.

Hunt failed to provide evidentiary support that the initial concern was of a gang related shooting, the color of clothing of the victims suggested gang involvement, or that Germaul's tattoo indicated gang activity. These assertions are conclusory and he failed to support them with references to the record. Although he asserts that the gang involvement of the men at the park is well known, he provides no evidence in the record to show how or to whom it is well known.

The only witness Hunt had to testify to gang affiliation was Vega, who stated he only knew Germaul and he could only speculate about gang affiliation of the men at the park. The record reflects that the men who had been at the park claimed no gang involvement and unanimously stated that a red SUV drove by and the driver started shooting. Celia Vega expressed concern of retaliation by Germaul's family but never expressed concern of gang activity. Moreover, during his interrogation, Hunt never claimed the shooting was gang related. Instead, he claimed it had to do with the two men at the park who had robbed and shot him previously. Further, no evidence provided an explanation for the assertion that Germaul's "357" tattoo was gang affiliated. Because the record provides no link between the evidence and gang involvement, it cannot provide foundation that the men at the park were involved in gang activity. Without proper foundation, such assertions are speculative and thus inadmissible. The district court properly excluded the evidence.

10

Hunt asserts the evidence was material to his self-defense claim in support of his assertion that the men were going to shoot at him and he shot out of fear for his safety. Yet he also asserts the evidence did not show whether he or the men shot first and that was the material fact in question.

Hunt admitted he shot toward the park once he saw some men reach for their guns. He also stated he did not realize the men shot back until after he had already started shooting. Additionally, Hunt stated that when he turned the corner by the park he saw the two men who had robbed him and he "started spraying." He claimed no gang activity but a fear for his safety because the men were armed and two of them had shot him previously.

Although the issue of who shot first is material to the case, that issue had already been resolved. Because Hunt admitted to shooting first, the issue was whether he reasonably believed such force was necessary to defend himself against the men's imminent use of unlawful force. He told detectives his fear stemmed from previously being shot by two of the men and the fact that the men were armed. He never contended that his fear stemmed from becoming the target of a shooting committed to gain rank within a gang. Gang involvement was not material to determine who shot first or whether Hunt was justified in shooting first. The district court did not err.

Hunt does not contend the district court based its determination on an error of law or fact, so he challenges the determination as a view no reasonable person would have adopted. Hunt contends the evidence of gang involvement was probative to his claim that the men shot at him without provocation. He also contends that gang involvement was probative because it would have explained the men's refusal to cooperate with law enforcement and court proceedings, and why Ahmad's testimony was inconsistent with the physical evidence.

11

Again, Hunt dismisses his admission that he shot first. Hunt shooting first would have served as provocation for the men to return fire. He provides no evidence to support his assertion that the potential gang involvement would explain the men failing to cooperate with the investigation and with court proceedings. Importantly, Anthony, Victor, and Gionni all provided statements to the police. Their cooperation with the investigation was not relevant to the charges—it was not material to the issues or probative to a fact asserted.

Although Ahmad initially refused to speak to the detectives, he testified at trial. He testified that when the shooting began he ran away from the street, he had no gun, and he did not see anybody from the park with a gun. The evidence supports his assertion that he turned and ran, as Hunt shot him in the buttocks. The evidence of him running away from the parking lot also supports his assertion that he did not shoot and did not see anybody else with a gun because his back would have been to the group. Hunt provided no evidence that Ahmad had shot at him.

Hunt erroneously asserts that the men shot without provocation. He provides no information about how Ahmad's testimony was inconsistent with the evidence. He has failed to provide anything more than conclusory statements in his assertion that gang involvement explained the lack of cooperation in the investigation and trial. Without a showing that the evidence was probative, Hunt could not establish that the probative value substantially outweighed the possible prejudicial impact. The district court did not abuse its discretion by finding the potential for undue prejudice outweighed the probative value.

"[T]he right to present a defense is subject to the statutory rules of evidence and case law interpreting those rules." *State v. Krider*, 41 Kan. App. 2d 368, Syl. ¶ 4, 202 P.3d 772 (2009). Thus, we can only review Hunt's assertion that the district court

12

prevented him from presenting his theory of defense if we first determine the district court erred by excluding the evidence.

"A defendant is entitled to present his or her theory of defense. The exclusion of relevant, admissible, and noncumulative evidence, which is an integral part of the theory of defense, violates the defendant's fundamental right to a fair trial." *State v. Baker*, 281 Kan. 997, 1008, 135 P.3d 1098 (2006). Hunt asserts the evidence of gang activity was a material fact in his self-defense claim and would have supported the claim that the men shot first or that Hunt shot first because he was in fear for his life. He also contends the evidence the men were armed because they were targets of a retaliatory shooting showed that they were prepared to shoot.

During the interrogation, Hunt admitted he shot first but said it was out of fear for his life. He also stated that two of the men in the park had attempted to rob him and shot him when he did not give them anything. In the interrogation, he showed the detectives his bullet wound and the detectives looked up a report from the event. Although Hunt did not report the shooting, a witness did. Hunt never expressed concern that the men who shot him were gang affiliated. He merely conveyed that they were men with whom he had been acquainted.

The district court instructed the jurors to disregard Vega's statement that the fighting at the park was gang related. After the court sustained the State's objection, Vega detailed his observations. Vega also testified he witnessed at least six people with guns, all of whom were wearing blue. Vega testified that the men at the park fired first. In addition, Det. Shorb considered the shooting a gunfight based on the two opposing groups of shell casings.

Hunt's theory that he shot as self-defense required him reasonably to believe that he needed to use physical force to defend himself against the men's imminent use of

13

unlawful force. He has failed to show that the restriction of specifically stating the men were gang involved, despite the many allusions to such involvement, prevented him from sufficiently presenting that he shot first because he was in fear for his life.

In *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012), the Kansas Supreme Court held that to find an error harmless under K.S.A. 60-261, K.S.A. 60-2105, and the United States Constitution, a Kansas court must be able to declare the error "did not affect a party's substantial rights, meaning it will not or did not affect the trial's outcome." The party benefiting from the error always bears the burden of proving it harmless under this standard. See *State v. Logsdon*, 304 Kan. 3, 39, 371 P.3d 836 (2016). The level of certainty by which a court must be convinced depends on whether the error implicates a federal constitutional right. *Ward*, 292 Kan. at 565. As the party benefiting from the error, the State "must prove beyond a reasonable doubt that the error would not or did not affect the outcome of the trial in light of the record as a whole." *State v. White*, 55 Kan. App. 2d 196, 208, 410 P.3d 153 (2017).

The State contends the jury did not believe Hunt acted in self-defense, demonstrated by the fact that he shot all three victims in their backs as they fled the shooting. The State points to the lack of bullet holes in surrounding houses or fences to support the fact that Hunt fired first. The only bullet hole in a house was in the house on the far corner, suggesting it was fired as Hunt left the park. Hunt had told detectives that he had to shoot first, but he also stated that if he had known Germaul was at the park, he would have taken himself out of the situation. The State asserts that such a statement proves Hunt's choice to place himself in the situation. It claims that excluding Vega's testimony about gang activity was harmless because the jury rejected Hunt's assertion that he acted in self-defense. Vega testified to the fighting in the park and that there were more than 10 people there wearing the same color. He also testified he observed at least six men with guns before the shooting began, though he later stated it was four.

14

Labeling the activity as gang activity was not required for Hunt to show that he acted in self-defense. Vega testified to the violence and guns at the park. Evidence supported the inference that the men were gang affiliated and being able to reference gang involvement would not have strengthened Hunt's defense. Even if the district court erred by excluding the evidence, it was a harmless error.

*Motion for a New Trial*

Before sentencing, Hunt moved for a new trial based on newly discovered evidence, alleging the State committed a *Brady* violation. Less than one month after the shooting, TPD officers interviewed Donald Rayton, Jr. for an unrelated case. Donald informed officers that Germaul's shooting had been retaliation for a shooting the night before. He identified Eduardo Retana, Victor's cousin, as the shooter.

"The court on motion of a defendant may grant a new trial to the defendant if required in the interest of justice." K.S.A. 2017 Supp. 22-3501. An appellate court reviews the trial court's decision on a motion for a new trial for an abuse of discretion. *State v. Williams*, 303 Kan. 585, 595, 363 P.3d 1101 (2016) (motion based on alleged *Brady* violation); *State v. Warren*, 302 Kan. 601, 614, 356 P.3d 396 (2015) (motion based on newly discovered evidence). "Judicial discretion is abused if judicial action is either: (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact." *Williams*, 303 Kan. at 595-96.

The United States Supreme Court held that a prosecutor's suppression of evidence favorable to the defendant upon request violates due process when the evidence is material to the guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). A *Brady* violation claim must contain three elements: (1) the evidence must be favorable to the defendant as either exculpatory in nature or

15

impeaching; (2) the State must have suppressed the evidence, whether inadvertently or intentionally; and (3) the evidence must be material. *Williams*, 303 Kan. at 596 (citing *State v. Warrior*, 294 Kan. 484, 505, 277 P.3d 1111 [2012]). "[B]ecause law enforcement's knowledge of evidence is imputed to the State, a *Brady* violation can occur when the prosecutor withholds material evidence that is not known to the prosecutor but is known to law enforcement." *Warrior*, 294 Kan. at 506. This court conducts a de novo review of a district court's determination on a *Brady* claim.

Hunt asserted that Donald's interview provided exculpatory evidence that he was not the shooter and presented credibility concerns for Victor. He also claimed the State had committed a *Brady* violation by not disclosing the evidence during discovery. The district court found that the State's failure to disclose the evidence was inadvertent and the evidence, while favorable to Hunt, was not material. Hunt contends that no reasonable person would have adopted the same view as the court when considering the large role Victor played in the investigation, Hunt's repeated attempts to introduce gang evidence, and his theory that the shooting was self-defense.

Hunt acknowledges his challenge is limited to whether the evidence provided was material to Hunt's case. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *Warrior*, 294 Kan. at 508.

The district court found that Donald's statements "constitute[d] little more than unfounded rumors, speculation, and hearsay" and addressed Donald's incarceration at the time of the park shooting. Because of his incarceration, Donald could not have firsthand knowledge of the shootings and any information he obtained would have been through unnamed third parties. Under K.S.A. 2017 Supp. 60-460, evidence of a statement made

16

by somebody other than the witness through testimony, if offered to prove the truth of the matter asserted, is hearsay evidence. Hearsay evidence is inadmissible unless it fits under a statutory exception to the general rule. K.S.A. 2017 Supp. 60-460. Additionally, as discussed above, speculative evidence is inadmissible. *Seacat*, 303 Kan. at 643.

Hunt summarized how Donald's statements could have altered his defense, but he failed to address the district court's findings that the evidence was speculation and hearsay. He failed to provide any information about how he would get otherwise inadmissible evidence admitted. He did not suggest that any hearsay exceptions applied and proffered no foundation to permit admissibility of otherwise speculative evidence. Because materiality for a *Brady* claim requires a showing that a reasonable probability exists that the outcome of the trial would have been different, the evidence must be admissible. The inadmissibility of the evidence prevents such a showing. Hunt also fails to acknowledge that he admitted to shooting at the park a month before Donald's interview. The evidence therefore is not material under the reasonable probability standard for *Brady* claims.

Because the evidence is not material, the district court did not err in determining the State committed no *Brady* violation. And so, a reasonable person would adopt the view of the district court that the inadmissible evidence did not warrant a new trial. Therefore, the district court did not abuse its discretion by denying Hunt's motion for a new trial.

*Jury Instructions*

For consideration of the lesser included offense of voluntary manslaughter, the district court instructed the jury to consider voluntary manslaughter, "[i]f you do not agree that the defendant is guilty of murder in the first degree, or murder in the second degree—intentional, or murder in the second degree—reckless." Hunt contends that

17

instructing the jury to consider voluntary manslaughter and second-degree murder sequentially rather than simultaneously constitutes clear error.

"When analyzing jury instruction issues, an appellate court follows a three-step process by: '(1) Determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless.' [Citation omitted.]" *State v. Pfannenstiel*, 302 Kan. 747, 752, 357 P.3d 877 (2015). "Whether a party has preserved a jury instruction issue affects the reversibility inquiry at the third step. 302 Kan. at 752; see also K.S.A. 2016 Supp. 22-3414(3) ('No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous.')." *State v. Louis*, 305 Kan. 453, 457, 384 P.3d 1 (2016).

"At the second step, we consider whether the instruction was legally and factually appropriate, employing an unlimited review of the entire record. [Citation omitted.] If the district court erred, and the error did not violate a constitutional right, 'the error is reversible only if [the court] determine[s] that there is a "reasonable probability that the error will or did affect the outcome of the trial in light of the entire record." *State v. Plummer*, 295 Kan. 156, 168, 283 P.3d 202 (2012) (quoting *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801[2011], *cert. denied* 565 U.S. 1221 [2012])." *Louis*, 305 Kan. at 457-58.

Hunt contends the district court erred by instructing the jury to consider voluntary manslaughter only after considering both first- and second-degree murder; however, the court used the instruction he proposed. Additionally, while reviewing jury instructions, Hunt did not object to the use of PIK Crim. 4th 54.170 (2016 Supp.), which includes the

consideration of voluntary manslaughter after jurors disagree that the defendant is guilty of murder. The court cut the initial jury instruction conference short because of time constraints after reviewing the instruction for manslaughter. The court instructed both parties to review the remaining instructions over the weekend to address concerns before court reconvened the following Monday. Hunt had no objections after his independent review of the jury instructions.

Under the first step, we must first determine whether Hunt properly preserved the issue for appellate review and whether the doctrine of invited error bars review.

Hunt failed to object to the jury instruction. If a party fails to object to an instruction, we evaluate whether the instruction was a clear error. *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014). The clear error determination must review the effect of the erroneous instruction in light of the entire record including the other instructions, counsel's arguments, and whether the evidence is overwhelming. *In re Care & Treatment of Thomas*, 301 Kan. 841, 849, 348 P.3d 576 (2015). To establish clear error, "'the defendant must firmly convince the appellate court that the giving of the instruction would have made a difference in the verdict.' [Citation omitted.]" *State v. Cooper*, 303 Kan. 764, 771, 366 P.3d 232 (2016). The "clearly erroneous" principle is not a standard of review; rather, it supplies a basis for determining if an error requires reversal of a conviction. *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 (2012).

The invited error doctrine applies only when a party both fails to object and invites the error by other actions; we review an invited error only if it is structural error. *Logsdon*, 304 Kan. at 31. "When defendant's requested instruction is given to the jury, the defendant cannot complain the requested instruction was error on appeal." *State v. Bailey*, 292 Kan. 449, 459, 255 P.3d 19 (2011). Whether the doctrine applies presents a question of law, and this court generally exercises unlimited review over questions of law. *State v. Hankins*, 304 Kan. 226, 230, 372 P.3d 1124 (2016).

19

Hunt proposed these instructions:

"The offense of murder in the first degree with which the defendant is charged includes the lesser included offenses of murder in the second degree and voluntary manslaughter."

"If you do not agree that the defendant is guilty of murder in the first degree, you should then consider the lesser included offense of murder in the second degree."

"If you do not agree that the defendant is guilty of murder in the second degree, you should then consider the lesser included offense of voluntary manslaughter."

Hunt proposed that the district court instruct the jury to consider voluntary manslaughter only after determining that Hunt was not guilty of first- or second-degree murder. The voluntary manslaughter instruction was the last one discussed in the instruction conference, and both parties agreed to it as proposed.

Because the district court provided the jury with essentially the same instruction Hunt proposed, Hunt agreed to the instruction on the record, and he does not claim the error was structural error, the doctrine of invited error bars review of this claim.

In case of review, we will examine the instruction. Hunt contends that we should review the issue under the standard set in *State v. Graham*, 275 Kan. 831, 69 P.3d 563 (2003). In *Graham*, the Supreme Court determined that instructing jurors to consider the lesser included offenses sequentially was clearly erroneous as it deprived the defendant the opportunity to have the jury consider mitigating circumstances that may have reduced his conviction for second-degree murder to voluntary manslaughter. However, in *State v. Brown*, No. 110,234, 2015 WL 3513997, at *5-6 (Kan. App. 2015) (unpublished opinion), *rev. denied* 303 Kan. 1079 (2016), the court determined that because second-

degree murder and voluntary manslaughter no longer required the same culpable mental state, the two no longer required simultaneous consideration.

Hunt claims the *Brown* court's holding overstates the effect of the revision of voluntary manslaughter from an intentional to a knowing crime. This revision may affect the State's burden in proving voluntary manslaughter, but it did not substantively alter its application as a lesser offense of second-degree murder. Under K.S.A. 2017 Supp. 21-5202(c), "Proof of a higher degree of culpability than that charged constitutes proof of the culpability charged . . . . If acting knowingly suffices to establish an element, that element is also established if a person acts intentionally." Hunt contends that K.S.A. 2017 Supp. 21-5205(c) shows that the change in mental state should not be the court's focus as it shows that if a person acted intentionally to commit second-degree murder it suffices to prove that he acted knowingly to commit voluntary manslaughter, subject to mitigating circumstances. Hunt maintains the legislative change should not obviate the finding in *Graham* that sequential consideration deprived Graham of the opportunity to consider mitigating circumstances that may have led to a conviction for attempted voluntary manslaughter rather than attempted second-degree murder.

This court has agreed that, "under K.S.A. 2016 Supp. 21-5205(c), proof of intentional conduct suffices to establish knowing conduct. However, we do not believe that K.S.A. 2016 Supp. 21-5202(c) applies to the application of lesser included offenses because the plain language of subsection (c) indicates it only applies to crimes charged." *State v. Younger*, No. 116,441, 2018 WL 911414, at *19 (Kan. App. 2018) (unpublished opinion). Subsection (c) does not apply here, where a defendant is charged with an intentional crime. It essentially refers to instances when the defendant is charged with a knowing crime but the State presents evidence sufficient for intentional conduct. In which case, the evidence sufficient for intentional conduct is sufficient to show knowing conduct.

21

The court also found:

"[T]he Kansas Legislature has separated knowingly from intentionally, while giving separate definitions to the terms. Second-degree murder is still defined as an intentional killing, while voluntary manslaughter is now defined as a killing committed knowingly. The existence of mitigating circumstance is no longer the only difference between the two crimes. When the Legislature revises an existing law, the court presumes that the Legislature intended to change the law as it existed prior to the amendment." 2018 WL 911414, at *19.

The court determined that the legal effect of the changes was that a court is no longer required to instruct jurors to consider the lesser included offenses of second-degree murder and voluntary manslaughter simultaneously. 2018 WL 911414, at *19.

This case is distinguishable from the above cases because the State charged Hunt with murder in the first degree and the instructions in question were for lesser included offenses. But the framework of the PIK Crim. 4th provides for sequential consideration of lesser included charges, just as from the charged offense. With the focus of the analysis on the culpable mental state of the offender, the instructions consider the lesser included offenses sequentially from the highest degree of culpable mental state to the lowest. Therefore, the district court did not err by instructing the jurors to consider the lesser included offenses sequentially.

Hunt also contends the district court erred by not instructing the jury that once he satisfied the burden of producing competent evidence of self-defense, the State had the burden of disproving the defense beyond a reasonable doubt. Hunt concedes that review is limited to a clear error standard because he failed to object at trial.

We review jury instruction issues using a three-step process. First, we must determine whether we can review the issue. Because Hunt failed to object at trial, he may

argue for the first time on appeal that the jury instruction was clearly erroneous. *Younger*, 2018 WL 911414, at *8. To establish clear error, the defendant must convince the appellate court that the verdict would have been different if the district court had given the instruction. *State v. Cooper*, 303 Kan. 764, 771, 366 P.3d 232 (2016). We must then determine whether an error occurred, and if so, whether the error was harmless. *Pfannenstiel*, 302 Kan. at 752. In the second step, we must determine if the jury instruction was legally and factually appropriate. An instruction is legally appropriate if it fairly and accurately states applicable law. *Younger*, 2018 WL 911414, at *8. We review whether an instruction was legally appropriate de novo. *Plummer*, 295 Kan. at 161. An instruction is factually appropriate when the facts of the case support it. To determine factual appropriateness, we review the evidence in the light most favorable to the defendant. *Younger*, 2018 WL 911414, at *8. If the first two steps are satisfied, we determine whether the error requires reversal. *Pfannenstiel*, 302 Kan. at 752.

Hunt argues that K.S.A. 2011 Supp. 21-5108(c) developed a new burden-shifting scheme with the assertion of an affirmative defense by a defendant. He claims the scheme requires the district court to provide an additional instruction that not only does the State have to prove the elements of the crime charged beyond a reasonable doubt, but it must also disprove Hunt's claim of self-defense. Without the additional instruction, the jury would have been misled or confused about the State's burden on the self-defense claim, which would make the omission of such an instruction clear error. Though *State v. Staten*, 304 Kan. 957, 377 P.3d 427 (2016), provides a nearly identical instruction issue, Hunt rejects this precedent based on *May v. Cline*, 304 Kan. 671, 676, 372 P.3d 1242 (2016), in which the court found: "The law of self-defense pertaining to criminal acts in Kansas has been modified such that a burden-shifting scheme is now employed."

At trial, the district court provided the jury the general instruction on burden of proof, found at PIK Crim. 4th 51.010:

"The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty unless you are convinced from the evidence that he is guilty.

"The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find the defendant guilty."

Instruction No. 21, found at PIK Crim. 4th 52.200, explaining the theory of self-defense provided:

"Defendant claims his use of force was permitted as self-defense.

"Defendant is permitted to use physical force against another person—including using a weapon—when and to the extent that it appears to him and he reasonably believes such physical force is necessary to defend himself against the other person's imminent use of unlawful force. Reasonable belief requires both a belief by defendant and the existence of facts that would persuade a reasonable person to that belief.

"Defendant is permitted to use against another person physical force that is likely to cause death or great bodily harm only when and to the extent that it appears to him and he reasonably believes such force is necessary to prevent death or great bodily harm to himself from the other person's imminent use of unlawful force. Reasonable belief requires both a belief by defendant and the existence of facts that would persuade a reasonable person to that belief.

"When use of force is permitted as self-defense, there is no requirement to retreat."

Like in *Staten*, PIK Crim. 4th recommends providing PIK Crim. 4th 51.050 when the court provides PIK Crim. 4th 52.200. The instruction provides:

24

"The defendant raises *describe the defense claimed* as a defense. Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant."

Hunt did not propose this instruction and did not object to its omission.

The *Younger* court concluded that Younger's reliance on *May* was misguided.

"First, the facts in Younger's case are clearly distinguishable from the facts in *May*, and that case does not even involve a jury instruction issue. Second, the language in *May* cited by Younger is dicta because it was not necessary to our Supreme Court's ultimate ruling in that case. Third, as our Supreme Court clearly explained in *Staten*, which was decided after *May*, the law regarding the proving of self-defense did not change as a result of the enactment of K.S.A. 2016 Supp. 21-5108(c)." 2018 WL 911414, at *10.

In *Staten*, the court found that the 2010 amendments to and codification of K.S.A. 2017 Supp. 21-5108(c) were merely a codification of existing caselaw requirements. 304 Kan. at 965. The amendment did not change the law regarding the State's burden of proof and created no new element to prove a charged crime. 304 Kan. at 965. The *Staten* court held that the failure to provide the PIK instruction was error but not clear error. 304 Kan. at 967. Because the error was harmless, it does not warrant reversal.

*Sufficiency of the Evidence*

Hunt contends the State failed to prove beyond a reasonable doubt that he did not act in self-defense. He asserts that the general rules for reviewing sufficiency of the evidence should extend to the State's burden to disprove self-defense. Hunt states the State failed to disprove that (1) Hunt believed he had to defend himself and (2) a reasonable person in his position would have believed he needed to defend himself against imminent use of deadly force.

25

When the sufficiency of the evidence is challenged in a criminal case, "[a]fter reviewing all the evidence in a light most favorable to the prosecution, the appellate court must be convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations." *State v. Kettler*, 299 Kan. 448, 466, 325 P.3d 1075 (2014). Circumstantial evidence is sufficient for conviction as long as it provides a reasonable basis from which the fact-finder may reasonably infer each element. *Logsdon*, 304 Kan. at 25. "It is only in rare cases in which trial testimony is so incredible that no reasonable factfinder could find guilt beyond a reasonable doubt that a guilty verdict will be reversed." *State v. Ramirez*, 50 Kan. App. 2d 922, 936, 334 P.3d 324 (2014).

According to K.S.A. 2017 Supp. 21-5222,

"(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force.

"(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person.

"(c) Nothing in this section shall require a person to retreat if such person is using force to protect such person or a third person."

This statute provides both a subjective and objective test. The State must disprove that Hunt honestly and sincerely believed that deadly force was necessary to prevent imminent death or great bodily harm and that a reasonable person would have believed such force was necessary. *State v. Salary*, 301 Kan. 586, 593-94, 343 P.3d 1165 (2015).

26

That said, the State asserts Hunt cannot claim self-defense because the justification as provided in K.S.A. 2017 Supp. 21-5222 is not available to any person who provokes the use of force against another person. K.S.A. 2017 Supp. 21-5226. K.S.A. 2017 Supp. 21-5226 provides the two exceptions that permit an aggressor to use self-defense as a justification for deadly force. The exceptions are:

> "(1) Such person has reasonable grounds to believe that such person is in imminent danger of death or great bodily harm, and has exhausted every reasonable means to escape such danger other than the use of deadly force; or
> "(2) in good faith, such person withdraws from physical contact with the assailant and indicates clearly to the assailant that such person desires to withdraw and terminate the use of such force, but the assailant continues or resumes the use of such force." K.S.A. 2017 Supp. 21-5226(c).

Hunt told detectives that he drove around aimlessly during the afternoon of the shooting and happened upon the park. As he approached the park, he saw the men draw their guns, and he began shooting out of fear for his life. No evidence suggested that Hunt knew the men who robbed and shot him previously were at the park. He stated he just reacted out of fear and began shooting. Although he claimed the shooting was a reaction, without thinking, his ability to begin shooting before the men shows that he was prepared to shoot when he arrived at the park. Additionally, Hunt informed detectives that he had not seen Germaul in the crowd, but if he had, he would have removed himself from the situation. This statement suggests that he could have left unscathed, not having engaged in a gunfight. However, because he did not see Germaul, he chose to approach the group, place himself in fear of his life, and shoot at the men in the park before they shot at him. Hunt's statements to detectives show that he was an aggressor under K.S.A. 2017 Supp. 21-5226(b) as he provoked the use of such force.

Additionally, the statements to police indicated that Hunt shot at the group of men when they were in the parking lot. Evidence showed multiple bullet holes and marks on the vehicles in the parking lot and the three men were shot in their backs, presumably from trying to run from the shooting. Hunt's SUV had one bullet hole in the driver's side door and police found only one bullet hole in the surrounding houses. Although Hunt claimed several men had guns, evidence only conclusively shows the shell casings from the parking lot had been fired from two different guns. There was no indication that the .380 at the park had been fired.

When reviewing the evidence in a light most favorable to the State, a rational fact-finder could have determined that Hunt was the aggressor and so unable to assert a claim of self-defense. The evidence was sufficient to support Hunt's convictions for intentional murder in the second degree and two counts of intentional aggravated battery.

*Cumulative Error*

Hunt contends that even if one error complained of above were not sufficient to warrant reversal, we should reverse his convictions based on the cumulative effect of those errors.

The test is whether the totality of the circumstances establishes that the cumulative errors substantially prejudiced the defendant and denied him a fair trial. In assessing the cumulative effect of errors during the trial, the appellate court examines the errors in the context of the entire record, considering how the district court dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014). See also *State v. Walker*, 304 Kan. 441, 457-58, 372 P.3d 1147 (2016).

We will find no cumulative error when the record fails to support the errors defendant raises on appeal. *Marshall*, 303 Kan. at 451. A single error cannot constitute cumulative error. *State v. Williams*, 299 Kan. 509, 566, 324 P.3d 1078 (2014).

Hunt contends that although the individual issues above may not have warranted reversal, the cumulative effect does. That said, the only issue raised that constituted error was the district court's failure to provide the PIK instruction for the burden of proof. That error was harmless and did not warrant reversal. Because a single error cannot constitute cumulative error, Hunt has failed to show that relief is warranted.

Affirmed.